

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 27, 2024

**BY ECF AND EMAIL**
The Honorable Christopher P. Tuite
United States Magistrate Judge
Middle District of Florida
801 North Florida Avenue
Tampa, Florida 33602

    Re: *United States v. Caleb Eccles-Gonsalves* 24 Cr. 391 (____)

Dear Judge Tuite:

    In advance of the presentment that is expected to occur later today, the Government respectfully submits this letter to provide the Court and defense counsel with a summary of the charges unsealed today in Indictment 24 Cr. 391 (____) (the "Indictment") and the bases for the Government's motion for pretrial detention of the defendant.

    The facts described below come from, among other sources, law enforcement reports, surveillance videos, records and communications obtained from judicially authorized search warrants for online accounts and electronic devices.

## I. The Indictment and the Arrest

    On June 20, 2024, a grand jury sitting in the Southern District of New York returned the Indictment, which charges Eccles-Gonsalves in Count One with conspiracy to illegally possess and transfer a machinegun, in violation of 18 U.S.C. § 371; Count Two with possession and transfer of a machinegun, in violation of 18 U.S.C. § 922(o)(1); Count Three with conspiracy to engage in the unlicensed business of firearms dealing, in violation of 18 U.S.C. § 371; and Count Four distributing narcotics, in violation of 21 U.S.C. §§ 812, 841(a)(1) and (b)(1)(C). The defendant faces a maximum term of imprisonment of forty years.

    The defendant was arrested this morning and will be presented today in the Middle District of Florida.

## II. Legal Standard

    The Government is seeking detention for Eccles-Gonsalves based on his danger to the community and the risk of flight.

    Where, as here, a defendant is charged with a controlled substance offense with a maximum term of imprisonment that is greater than ten years, there is a mandatory presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as

required and the safety of the community." 18 U.S.C. § 3142(e)(3)(A). The defendant bears the burden of producing evidence to rebut the presumption in favor of detention in this case. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). For the reasons explained further herein, Eccles-Gonsalves cannot overcome this presumption in favor of detention. But even if a defendant satisfies that initial burden, the presumption does not vanish; instead, it "remains a factor to be considered among those weighed by the district court." *Id*.

Even if the defendant could rebut the presumption in favor of detention, based on the danger he presents to the community and his risk of flight counsel in favor of his detention. The (1) nature and circumstances of the offenses charged, (2) weight of the evidence against the defendant, (3) history and characteristics of the defendant, including criminal history, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release weigh heavily in favor of detention in this case. *See* 18 U.S.C. § 3142(g). Consistent with the factors set forth in 18 U.S.C. §§ 3142(e)(3)(A) and (g), Eccles-Gonsalves must be detained to protect the community and prevent flight from prosecution.

### III. Overview of the Case

#### A. Firearm and Machinegun Conversion Device Sales

As charged in the Indictment, Eccles-Gonsalves has been engaged in a nearly year-long scheme to sell, among other things, firearms, machinegun conversion devices ("switches"), and narcotics. As described herein, over the course of the investigation, most interactions between Eccles-Gonsalves, including text message conversations and in-person meetings, were monitored as well as audio and video recorded.

Beginning in or about September 2023, a longtime Confidential Informant ("CI")[1] informed law enforcement that in or about July of the same year, the CI had begun communicating with Eccles-Gonsalves about purchasing firearms. During their initial conversation on or about July 13, 2023, Eccles-Gonsalves showed the CI a photograph of between 12 and 16 firearms that Eccles-Gonsalves claimed were proof of his ability to supply firearms. Eccles-Gonsalves explained, in sum and substance, that he worked with another individual ("CC-1") based in Florida, to obtain guns manufactured from Polymer80 kits. That is, Eccles-Gonsalves offered to sell a ghost gun—an unserialized firearm that is difficult for law enforcement to trace. Eccles-Gonsalves told the CI that the starting price for handguns and fully automatic rifles was approximately $1,500.

In or about January 8, 2024, the CI and Eccles-Gonsalves began discussing the sale of a ghost gun. During the same conversion, Eccles-Gonsalves told the CI that he had spoken to CC-1 and the firearms would be ready whenever the CI was prepared to receive them. The CI made clear to Eccles-Gonsalves that the guns would be "community guns" (*i.e.*, guns shared by gangs or other

---

[1] The CI is a paid confidential source who has been providing information to law enforcement in exchange for monetary compensation since approximately 2018. Information provided by the CI has been reliable and has been corroborated by, among other things, surveillance video, law enforcement surveillance, and phone records.

criminal organizations to carry out illegal activity) and told Eccles-Gonsalves, that he would solicit orders and let Eccles-Gonsalves know how many firearms he'd like to purchase.

On or about January 23, 2024, the CI placed an order for a ghost gun from Eccles-Gonsalves, and shortly after, sent a total of $1,400. Despite the payment, the delivery of the ghost gun has been repeatedly delayed. Throughout February, Eccles-Gonsalves informed the CI through a series of text messages that, in sum and substance, certain parts needed to come in before the ghost gun could be completed.

During the period during which the ghost gun delivery was delayed, Eccles-Gonsalves sold two machinegun conversion devices to the CI. Specifically, Eccles-Gonsalves sold the CI two "switches," that is, machinegun conversion devices. An autoswitch is a small device that can be attached to the rear of a handgun's slide, allowing it to function as a fully automatic firearm.[2] Switches are considered machineguns for the purposes of 18 U.S.C. § 922(o).

For the first switch, in or about early March 2024, Eccles-Gonsalves worked with an individual based in St. Petersburg, Florida ("CC-2") to have the switch mailed from Florida to New York for sale to the CI. Before doing so, Eccles-Gonsalves told the CI that he (Eccles-Gonsalves) had ensured that the switch was ready to install, explaining, "I had the sear shaved so to spec all you got do is slap that hoe on." Eccles-Gonsalves then provided CC-2 with a fake name and directed CC-2 to use the fake name when CC-2 addressed the parcel containing the switch. On or about March 7, 2024, Eccles-Gonsalves texted the CI "Pull up" with a photograph of a USPS Priority Mail envelope. The CI then met Eccles-Gonsalves at his home in Brooklyn and purchased the switch for approximately $1,300.

During the sale of the switch (which was audio and video recorded), Eccles-Gonsalves told the CI, in sum and substance, that when he and his co-conspirators ship firearms and firearm parts through the mail, they use fake names to avoid detection by law enforcement. Eccles-Gonsalves also told the CI, in sum and substance, how to install the switch and warned him to be careful with the switch because there had been a recent to change in the law related to switches. Finally, Eccles-Gonsalves showed the CI how to use the switch, pushing a button on the switch back and forth and, at the same time, saying repeatedly "semi, auto" (*i.e.*, pushing the button on the switch in one direction makes the firearm a semi-automatic, and pushing the same button the other way makes that firearm fully automatic).

In early May, Eccles-Gonsalves sold a second switch to the CI. The second switch sale was first discussed between Eccles-Gonsalves and the CI during a meeting on or about May 9, 2024 in New York, New York (the "May 9 Meeting"). On or about May 28, 2024, the CI met another of Eccles-Gonsalves's co-conspirators ("CC-3") and paid CC-3 $1,300 for the second switch. The meeting was audio recorded.

On or about May 29, 2024, while in Florida, Eccles-Gonsalves sent the CI a text message stating, "button sent off." On or about June 1, 2024, a USPS flat rate package, depicted below,

---

[2] For more information, *see* https://www.youtube.com/watch?v=ECYPYyRTxLM.

arrived at a PO mailbox in New York, New York, controlled by federal law enforcement. The package contained a small plastic container which held a machinegun conversion device.

In May 2024, Eccles-Gonsalves traveled to Florida, where he continued conversations about firearms dealing as well as the sale of narcotics. Specifically, on or about May 29, 2024, Eccles-Gonsalves sent the CI the below left photograph, which he indicated depicted a firearm that Eccles-Gonsalves said was the gun that the CI had ordered. On or about June 3, 2024, Eccles-Gonsalves texted the photograph below right of a 7.62 Ruger rifle and represented to the CI that, in sum and substance, he could also bring and sell it to the CI for approximately $2,500:




### B. The Parcel Seizure

As described above, Eccles-Gonsalves and his co-conspirators use the U.S. Postal Service to ship firearms and firearms components. During the investigation, law enforcement officers seized a parcel associated with Eccles-Gonsalves and CC-1. The parcel contained a firearm, suppressor, and ammunition. As with the package containing the first switch, the parcel containing the ghost gun was shipped using false names as well as a fake address. Specifically, on or about October 26, 2023, CC-1 texted Eccles-Gonsalves, "that thing going out today or tomorrow." That same day, a USPS mail envelope was shipped from St. Petersburg, Florida, bearing the return address of "Josh Evans, 4492 Neptune Drive SE, St. Pete, Florida 33705" and the delivery address of "Orville Evans, 49 East 32nd Street, Flatbush, BK 11226." The address associated with "Orville Evans" is Eccles-Gonsalves's home address and the address listed for "Josh Evans" is very close to that of CC-2 and used on the package shipping the switch. The Josh Evans address (4492 Neptune) does not exist. The next day, on or about October 27, 2023, CC-1 texted Eccles-Gonsalves, "be on point today." Because of an issue, the First Parcel was not delivered on October 27, 2023, but instead held at a Brooklyn Post Office for pickup.

The parcel remained unclaimed at a Brooklyn Post Office and could not be returned to the sender because the address was fake. Pursuant to a search warrant, law enforcement searched the parcel and found a constructed Polymer80 handgun (a ghost gun), suppressor, two magazines, and twenty 9mm rounds of ammunition:




### C.  Narcotics Sales

Over the course of the investigation, Eccles-Gonsalves sold narcotics to the CI on three occasions. On at least one other occasion, Eccles-Gonsalves offered narcotics for sale to the CI via text message. Specifically:

- On or about January 11, 2024, the CI met Eccles-Gonsalves at his home in Brooklyn, New York (the "Caleb Residence") and purchased approximately 2.66 grams of cocaine base for $175. The NYPD lab has confirmed that the substances purchased contained cocaine base. During the transaction, the CI witnessed Eccles-Gonsalves preparing crack cocaine for distribution.

- On or about January 24, 2024, the CI met Eccles-Gonsalves at the Caleb Residence and purchased approximately 30.517 grams of crack cocaine for $1,000. The NYPD lab has confirmed that the substances purchased contained cocaine base. During the transaction, the CI again witnessed Eccles-Gonsalves preparing crack cocaine for distribution.

- On or about May 9, 2024, Eccles-Gonsalves met with the CI in Manhattan at the CI's request and delivered an eighth of an ounce of crack cocaine.

- On or about May 31, 2024, Eccles-Gonsalves represented to the CI in text message conversations that, in sum and substance, he could drive from Florida to New York City and bring with him approximately 28 blue oxycodone pills (out of a batch of 120 that he had procured) that he could sell to the CI for approximately $17/pill.

### D. Continuing Firearms Conversations and Firearms Handling

On a June 6, 2024 FaceTime conversation with the CI, Eccles-Gonsalves (who was still in St. Peterburg, Florida) indicated that he would be traveling to New York City the following week. On the same FaceTime call, he displayed multiple firearms and magazines, including the 7.62 Ruger rifle, and what appears to be at least one other high-caliber firearm. While Eccles-Gonsalves was showing the CI the weapons, there was a toddler next to or near him:





Eccles-Gonsalves was arrested in the Middle District of Florida this morning, June 27, 2024. At the time of his arrest, law enforcement officers executed a search warrant in the home in which Eccles-Gonsalves was staying in St. Petersburg. During the search, as depicted below, law enforcement officers recovered, among other things, thirteen firearms, magazines, ammunition, and a lower receiver.



As depicted below, in the bedroom in which it appears Eccles-Gonsalves was staying, a 7.62 semi-automatic rifle and an AR-style pistol were recovered, unsecured, from a soft bag at the foot of the bed. In addition, a handgun was unsecured in a nightstand and a bottle of promethazine was left unsecured on a television stand. An officer who participated in the search also reports that each recovered firearm had inserted a loaded magazine. Two minor children were in the home, including a child approximately two-years old who also appeared on the June 7 FaceTime conversation referenced above.



## IV. Pretrial Detention is Warranted

The Government is seeking detention for Eccles-Gonsalves based on his danger to the community and the risk of flight.

With respect to the danger to the community, we need only look as far as the nature and circumstances of the charged offense. Eccles-Gonsalves sold the following items to a CI: a ghost gun, two machinegun conversion switches, and crack cocaine. In addition, he participated in the shipment of a package that contained a ghost gun, a silencer, two magazines, and ammunition. The items Eccles-Gonsalves sold are among the most lethal available. Switches turn already dangerous semi-automatic guns into fully automatic weapons that can empty a clip of bullets with just a single pull of the trigger. Switches have been used in some of the most devastating shootings in recent history. For example, a Glock with an autoswitch was used in an April 2023 shooting in Dadeville, Alabama during which 89 shell casings were recovered from the scene where four people were killed and 32 others injured.

And Eccles-Gonsalves made it clear to the CI that he knew *exactly* how dangerous switches were when he remarked on the changes in law surrounding the use of surrounding their use and explained to the CI how to install the switch and its function in moving from "semi to fully." According to the ATF, there has been a 570% increase in recoveries of switches at crime scenes between 2017 and 2021. People like the defendant—who place profit over the safety of their communities—are directly responsible for the profound increase in lethality of guns on the streets.

To make matters worse, Eccles-Gonsalves made those sales after the CI told him he intended to purchase ghost guns that would be used as "community guns," that is, guns that are shared by gang members and used in furtherance of their criminal activity. That is, he was willing to supply unserialized firearms that make it easier for other criminals to evade detection by law enforcement. As the Court is well aware, gang and gun violence are plaguing communities across the country—including in New York and Tampa—and Eccles-Gonsalves was willing to make illicit profit despite knowing that the weapons he sold would be fueling that violence.

That isn't all. Eccles-Gonsalves offered to sell to the CI a 7.62 Ruger rifle and oxycodone pills, and in the process of displaying multiple firearms and magazines, handled them with a toddler just a few feet away. Thus, Eccles-Gonsalves and his weapons aren't just a danger to the community generally—they are a danger to those right inside the home he has been residing for the last month.

The extreme danger that Eccles-Gonsalves poses to the community as well as those in his own home was reinforced this morning during the search of the home in which he was staying in Florida. As explained above, unsecured firearms were recovered from his bedroom, well within reach of a toddler whom he had previously exposed to guns as evidenced by the June 7 FaceTime. Eccles-Gonsalves's recklessness poses a danger not only to those whom he would sell firearms and the community into which he would inject deadly weapons but also to those with whom he lives, including small children.

If that weren't enough, it appears that Eccles-Gonsalves sales are not confined to just the CI. A parcel bound for Eccles-Gonsalves's home in Brooklyn was intercepted in October 2023

and found to contain a suppressor, a ghost gun, two magazines, and ammunition. In addition, Eccles-Gonsalves indicated that one of the reasons for the delay in delivering the ghost gun that the CI paid for in January 2024 was that it was shipped to a different customer. Combined with the arsenal of firearms that Eccles-Gonsalves showed to the CI at their initial meeting and over FaceTime, it's clear that Eccles-Gonsalves trafficking operation is not simply one or two firearms here and there.

Eccles-Gonsalves's flight risk, based on the weight of the evidence and Eccles-Gonsalves's ties to Florida, weigh in favor of detention. With respect to the weight of the evidence, as laid out above, there are recordings of controlled purchases of switches and narcotics; surveillance video and text messages involving Eccles-Gonsalves's communications with the CI and co-conspirators discussing the shipment of firearms and the sale of narcotics, all of which align with the timing of when packages were sent and arrived, as well as return and sender addresses linked to Eccles-Gonsalves. Indeed, Eccles-Gonsalves was arrested this morning at the address where the multiple firearms were shown to the CI over FaceTime. In short, the evidence is overwhelming, and provides further incentive for Eccles-Gonsalves to flee from the jurisdiction of the Southern District of New York, where he will ultimately have to face the charges against him.

His ties to Florida provide further means for him to flee. Members of his family, including his co-conspirators, are based in Florida, giving him a ready place and connections that can help him hide from federal authorities. Indeed, he has spent approximately the last month in St. Petersburg, Florida. Eccles-Gonsalves has also shown a willingness to use fake names and addresses to evade detection by law enforcement and is unlikely to stop doing so now.

***

Accordingly, for the reasons set forth above, and in light of the danger to the community and risk of flight, the Government respectfully submits that the defendant presented today be detained pending trial.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: *Ashley C. Nicolas*
Ashley C. Nicolas / Timothy Ly
Assistant United States Attorneys
Southern District of New York

cc: Counsel of Record (by ECF and email)
Pretrial Services (by email)